**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 19-60432-CIV-ALTMAN/Hunt**

**RLI INSURANCE COMPANY**,

  *Plaintiff/Counter-Defendant*,

v.

**RAYMOND ALFONSO,**

  *Defendant/Counter-Plaintiff*,

and

**SUNRISE TRANSPORTATION, INC.,**

  *Defendant.*

_____/

## ORDER

  This is a case about a car. Actually, it's a case about *what kind of car* picked Raymond Alfonso up from the Park Creek surgery center on June 7, 2016 and transported him home. In the state-court lawsuit between Alfonso and the transportation company (Sunrise), Alfonso took the stand, swore an oath to tell the whole truth, and testified that he was badly injured when Sunrise's owner picked him up, not in a *white* company van, but in a smoke-filled *black* BMW—a black BMW that jostled violently when the owner sped negligently over a speedbump. And trial wasn't the first time he'd said so. Months before the trial, in responding to Sunrise's interrogatories, Alfonso took the same oath and proceeded to tell the same story about the same smoke-filled black BMW that had picked him up from the clinic after his surgery. In both his interrogatory answers and his trial testimony, in fact, Alfonso went into great detail about the black BMW in which he was injured: its color; its make; its model; its size; how low to the ground it was; and the location and appearance of its seatbelts.

1

Nor was any of this mere ornamentation. Alfonso and his lawyer sought to paint a picture for the jurors—of a business owner so overbooked on a rainy Miami afternoon that he drove over to the clinic himself; of a driver who was intoxicated, in over his head, and speeding; and of a black BMW that was so low to the ground that, when it raced over a speedbump, it injured Alfonso in a way that wouldn't have been possible in one of Sunrise's white transportation vans.

Nor was any of this testimony uncorroborated. To the contrary, time and again in his statements to his doctors Alfonso said (as he did at trial) that he was injured, not in a white van, but in a new-model, black BMW. And the jury believed him. After hearing from Alfonso—and after reviewing the evidence by which Alfonso's testimony was corroborated—it awarded him $1,391,000.

That's when things went downhill. Alfonso and his lawyer couldn't collect from Sunrise, which never appeared in the state-court case (or in this one). So, they turned to Sunrise's insurer—RLI, our Plaintiff. The problem is that RLI insured 28 vehicles at Sunrise—*white vans* all of them. Since Alfonso—by his own testimony—was injured in a black BMW, Alfonso (and his lawyer) had to come up with a new plan: a plan to disavow his prior testimony by submitting new evidence—most of it irrelevant or inadmissible—for a new theory. Perhaps, they now suggest, Alfonso was injured in a covered white van after all. Maybe his surgical medication, when coupled with his "mild memory loss," helped create—of whole cloth—a false (albeit tremendously detailed) memory of the black BMW and its attendant characteristics.

Of course, they couldn't have Alfonso testify to any of this. That would have been absurd. So, they've tried to establish their new theory by other, circumstantial evidence. His wife, they say—together with a gardener and a neighbor—once helped him up after he fell on the sidewalk. Some or all of those people may have seen a white van in the area of Alfonso's fall—though, whether that fall happened on the same day as our incident, no one can say. And, Alfonso's lawyer adds, Alfonso does suffer from "mild memory loss," and he was prescribed some serious medication during his surgery.

2

But Alfonso cannot hide from some basic—and undisputed—facts: no one ever saw him ride home in a white van or emerge from a white van on June 7, 2016; no one, in fact, can say that the van in the vicinity of his sidewalk fall—whenever that was—was there to drop *Alfonso* off; nor can anyone link that fall to June 7, 2016; to the contrary, despite his very detailed testimony about the events of June 7, 2016, Alfonso never mentions any fall that day; and, even if Alfonso could establish all these things, he hasn't presented a shred of evidence for the last critical piece of this puzzle—that the vehicle he rode in on the day of his injury was owned by Sunrise and insured by RLI. Indeed, despite having over a year to take discovery, he doesn't have the vehicle's license plate, its VIN number, or even its make and model.

As this summation makes plain, Alfonso has adduced no evidence from which a reasonable juror could infer that, on June 7, 2016, he was injured in a white van owned by Sunrise and insured by RLI. Accordingly, RLI's Motion for Summary Judgment [ECF No. 35] is **GRANTED** and Alfonso's Motion for Partial Summary Judgment [ECF No. 39] is **DENIED as moot**.

## THE FACTS

### I.    The Incident

On June 7, 2016, Raymond Alfonso underwent an outpatient "rhizotomy" at the Park Creek Surgery Center ("Park Creek") in Coconut Creek, Florida. *See* Plaintiff's Statement of Facts ("Pl. SOF") [ECF No. 34] ¶ 1.[1] After his surgery, at around 1:50 p.m., Alfonso was transferred to post-anesthesia care. *Id.* ¶ 4. Although a medical transportation company (Sunrise) was supposed to drive Alfonso home, by 3:00 p.m., it still had not arrived. *Id.* So, at 3:30 p.m., a Park Creek representative

---

[1] The Court will only cite to the Pl. SOF in situations where Alfonso has failed to rebut a proposition RLI has asserted in that document. S.D. FLA. L.R. 56.1(b) ("All material facts set forth in the movant's statement filed and supported as required above will be deemed admitted unless controverted by the opposing party's statement provided that the Court finds that the movant's statement is supported by evidence in the record.").

called Sunrise to inquire about Alfonso's ride. *Id.* Whoever answered the call assured the Park Creek employee that the Sunrise driver was five minutes away. *Id.* Thirty more minutes passed before Park Creek called Sunrise again; this time, the Sunrise rep insisted that its driver was "in route." *Id.* Some thirty minutes later, noting that "Pt. very unhappy," Park Creek called Sunrise a third time. *Id.* This third call must have done the trick because, at 4:47 p.m.—some two-and-a-half hours late—someone from Sunrise finally showed up. *Id.*

This whole case boils down to what happened next—or, more precisely, to what kind of vehicle showed up. At this point in our story, though, it suffices to say that Alfonso was picked up by an "auto." *Id.* ¶¶ 5–6 (Park Creek record showing that at "1647 [4:47 p.m.] – transportation service avail. Void prior to D/c. assist *to auto*" (emphasis added)). On the way to Alfonso's home, the driver "accelerated again and he approached 70 miles an hour and then we hit bumps. And he kind of lost control of it and I went flying up. The seat belt that would hold me was not connected. The one that would keep me from the windshield was, that was connected. So I didn't go that way, but I went up, and that's where it really I guess caused the problem." State Court Trial Tr. [ECF No. 34-6] at 15. "And then when I landed down on the seat, it was like something was driving up through my spine." *Id.* at 16. Alfonso didn't report the incident to the police. *See* Pl. SOF ¶¶ 8–9.

## II.     The Post-Incident Treatment

In the months following the incident, Alfonso told several doctors that he'd been injured in a car, not a van. So, for instance, on July 21, 2016—a little more than a month after the incident—he saw a chiropractor, Dr. Nicholas Ruggiero. *See* Ruggiero Intake Form [ECF No. 34-3]. In response to a question on the intake form that asked "In your own words, describe the accident in detail," Alfonso wrote: "I was released from Park Creek Surgery Center to a medical transport service of my insurance co preferred care (United Health). The Driver picked me up in a BMW 5 and drove over 90 MPH

over speed bump. The car crunched down on me and we went up in the air and landed at the next speed bump." *Id.*

Eleven days later, on August 1, 2016, Alfonso called the Ruggiero Clinic and said that "he fell twice yesterday and needed help getting up." Ruggiero Clinic Communication Log [ECF No. 41-5]. The next day—Tuesday, August 2, 2016—he fell again. We know this because, two days later, on August 4, 2016, he sent Ruggiero an email, in which he wrote that "I fell again Tuesday, this time outsied bu mial box. a neighbor attmpted to pick me up but had to get 2 lawn works to carry me back in the house. i stayed in bed yesterday and wll go to dr Trinidad tomorrow. I am soaked with urine all the time." Ruggiero Email [ECF No. 41-6] (errors in original).[2]

The next day, August 5, 2016, Alfonso visited Dr. Elizabeth Trinidad, a neurologist. *See* Trinidad Dep. [ECF No. 36-6]. On the intake form, Alfonso wrote that his injury occurred when a "rozodmy [sic] performed at Park Creek Surgery Center. Medical transport company service picked me up, but in a car[.] Drove over 70 MPH over speed bump and injury occurred." Trinidad Files [ECF No. 41-4] at 12. Dr. Trinidad later testified that "I remember the first time I met him. It was pretty dramatic. He was having a lot of trouble walking and peeing on himself. And it was kind of a scary thing to watch. And I sent him to the emergency room because I was worried that he was going to have permanent nerve damage." Trinidad Dep. at 11. So, Dr. Trinidad sent Alfonso to JFK "because I had privileges there" and, on August 10, 2016, performed an "emergent" stabilization of the lumbar

---

[2] Although this email first appeared in the Plaintiff's reply brief, RLI did use it during the deposition of a neighborhood gardener, Jamal Anderson, *see* Anderson Dep. [ECF No. 36-2] at 12—a deposition that will soon become important to our story. In any event, Alfonso never asks this Court to disregard the email. To the contrary, he specifically responded to the email in a document he labeled "Defendant's Additional Disputed Facts." [ECF No. 43] ¶ 113. In that document, he argued that the email actually supports his position by (in his view) referring to a fall he suffered on June 7, 2016, which was also a Tuesday. *Id.* Alfonso, in short, doesn't contest the authenticity of the email, wasn't surprised by its production, and (indeed) believes that it supports his position. The Court will therefore consider the email here.

spine. *Id.* at 13. As Dr. Trinidad remembered it: "He told me that he had – he was being transported home from a pain management, I believe appointment, and that he was in a van that went over, like, a bump – something that caused him to fly up in the air . . . and land hard." *Id.* at 12. In her progress notes, dated March 16, 2017, Dr. Trinidad wrote that Alfonso's injuries "occurred after a motor vehicle accident on 7/16/2016." Trinidad Notes [ECF No. 36-11].

One year after the incident, in June of 2017, Alfonso visited a chiropractor, Andrew Eisele. *See* Eisele Intake Form [ECF No. 34-4]. On the intake form, Alfonso wrote that "[s]omeone in a car picked me up and drove me home at speeds up to 90 mph. The driver hit a speed bump, lost control and [I] was remove[d] by [a] neighbor." *Id.*

### III.    The State-Court Case

In February of 2017, Alfonso sued Sunrise in state court for his injury. *See* State-Court Complaint [ECF No. 4-1]. RLI initially retained a lawyer to represent Sunrise. *See* Defendant's Statement of Facts [ECF No. 36] ¶¶ 59–61. But, after Sunrise refused to meet with the lawyer, RLI disclaimed coverage and withdrew. *Id.* During discovery in the state-court case, Alfonso repeatedly and consistently swore, under penalty of perjury, that his injury occurred in a black BMW. So, for example, in his interrogatory answers, Alfonso wrote that he was driven home in "a black BMW which had the odor of pot and liquor," and attested that "[a] black BMW driven by a person who was driving near twice the speed limit and resulted in my injuries as described in [Question] 8 above." State-Court Interrogatories [ECF No. 34-5] at 4. Later in that same document, he swore that: "No, I was unable to wear a seat belt. I asked the driver several times to assist me with putting on my seat belt. The BMW seat was low and when I attempted to put the seat belt on, the driver was driving so fast and swerving making it impossible to fasten the seatbelt." *Id.* at 22.

Sunrise did not answer (or otherwise appear in) the state-court case, so the judge entered a default on liability and set the case down for a damages-only trial. *See* State-Court Default [ECF No.

36-7]. At that damages trial, which took place in February of 2019, Alfonso's lawyer—the same law firm defending him here—called only one witness, Alfonso. After swearing an oath to tell the truth, Alfonso recalled (in vivid detail) the events of June 7, 2016. *See* State-Court Trial Tr. at 10 ("Q: And as you sit here today, this is something that you still have personal knowledge of? A: Yes."). As Alfonso explained: "There was no transport ever. It was a vehicle that belonged to the owner, director of Sunrise. Their vehicles were in use. And he was driving a very late model, very expensive BMW. And when I went into the car there was a seat belt down and a seat belt up, and the one on the down never got to me, and the one on the up was locked." *Id.* at 10–11. Alfonso affirmed that Sunrise's owner "was the only other person in the car." *Id.* Although Sunrise's owner didn't secure Alfonso's seat belt, a Park Creek employee did—at least partly. *Id.* at 14 ("Q: So the question was, at no time did the driver of the vehicle secure you into the seat? A: No. The medical personnel at Park Creek Surgery Center, they made sure I had the shoulder belt before I left. . . . Q: And before Sunrise left, he didn't check to make sure that the seat belt was secured properly? A: No.").

The ride home was harrowing. In Alfonso's words: "The gentleman was driving very, very fast and I was begging him to slow down going down Hillsboro Boulevard, because he was going into a very, very high speed and way above the speed limit. And he was speaking Spanish." *Id.* at 12. Alfonso attested that "[h]e kept on speaking in Spanish to a group of I guess people working for him, and he was very upset that things were running late because the surgery center was closed. When he came, I was the last patient out of Park Creek Surgery Center that day, and they kept on calling Sunrise trying to make them pick me up. And the medical transport that had picked me up in the morning, I guess was busy and there was no medical transport I guess. I'm not sure." *Id.* at 15. In the end, Alfonso was sure that Sunrise's owner picked him up in a low black BMW. *Id.* ("But I was picked up in a late model BMW that seem [sic] to be his, the owner's? Q: Of Sunrise Transportation? A: Of Sunrise Transportation.").

Alfonso then proceeded to describe—sometimes with great specificity—the injury he sustained in the BMW, his many surgeries, and the host of troubles that followed. *See id.* at 18–34. What he *never* said, however—not to any doctors or nurses, not in any intake form or email, not in his interrogatory answers, not even in his lengthy trial testimony—is that, after being dropped off in front of his house on June 7, 2016, he fell and had to be carried into his home by his neighbor and a gardener. The jury awarded Alfonso $1,391,000. *See* Jury Verdict [ECF No. 36-17].

**IV.    Our Case**

After the trial, RLI filed this declaratory judgment action, in which it asks the Court to declare that it has no duty to indemnify Sunrise for Alfonso's injury. *See* Amended Compl. [ECF No. 4] ¶ 46.[3] In response, Alfonso—and his lawyer—have devised a clever new strategy: to try to undermine everything Alfonso has said—not just in the state-court litigation, but in the intake forms and to the doctors—about where (and, specifically, in what sort of vehicle) his injury occurred. To accomplish their objective, Alfonso and his lawyer adduced four kinds of evidence: (1) opinions about his failing memory; (2) two bits of hearsay; (3) some irrelevant evidence of law and custom; and (4) the testimony of Alfonso's wife, his neighbor, and his gardener—the three people who helped Alfonso after he fell (on an *unknown* day) in front of his house. Since the case turns on this evidence, let's take a moment to go through each of these buckets here.

*First*, Alfonso submits some evidence of his failing memory—though he has no proof of his alleged tendency to "confabulate."[4] Response to the Plaintiff's Motion for Summary Judgment ("Response") [ECF No. 37] at 2. So, Alfonso points to a February 2018 letter from his chiropractor

---

[3] Alfonso counterclaimed with his own request for declaratory judgment. *See* Answer, Affirmative Defenses, and Counterclaims [ECF No. 15].

[4] That's not entirely true. Months after the close of expert discovery, Alfonso submitted the expert report of a neurologist, Dr. Richard Kishner. *See* Kishner Affidavit [ECF No. 36-9]. But, because the Court is granting the Plaintiff's Motion to Strike Dr. Kishner's testimony, the Court will not lay out his views here.

that described him as "having some mild speech impairments and mild memory loss." Eisele Letter [ECF No. 36-10]. Eisele—who began treating Alfonso in June of 2017 (one year after the incident)—added, at his deposition: "I think there was a point, I don't know how long later, that he was getting, can I say crazy in the head?" Eisele Dep. [ECF No. 36-5] at 20. Later at that same deposition, however, Eisele admitted that he was not a neurologist, that he did not treat patients for memory loss, and that he had no medical expertise in psychology, neurology, dementia, or neurocognitive function. *Id.* at 21, 65. In fact, he conceded that Alfonso always showed up to appointments, *id.* at 27, and that he never saw (or heard) Alfonso hallucinate, invent things, or otherwise fabricate the truth, *id.* at 60–61. Alfonso also points to a January 2017 note, in which Dr. Po-Heng Tsai (another neurologist) recommended that Alfonso "do a neuropsychological evaluation to better assess your memory issues." Tsai Notes [ECF No. 36-12]. And, lastly, Alfonso relies on a snippet of Dr. Trinidad's deposition, where, in response to the question "[w]ould it surprise you as a physician to know that Mr. Alfonso has memory issues?" she replied that "I have seen him have cognitive decline since the time I've known him." Trinidad Dep. at 18; Response at 4.

*Second*, Alfonso submits some out-of-court statements and offers them for the truth of the matters there asserted. So, for example, he shows us the Explanation of Benefits ("EOB") his health insurer mailed him, in which the insurer agreed to pay Sunrise for the transport. *See* Response at 4; EOB [ECF No. 15-2] at 6. Alfonso also insists that, on one occasion, he told Dr. Trinidad that he'd been picked up in a van, *see* Trinidad Dep. at 11 ("He told me . . . that he was in a van that went over, like, a bump[.]")—even though, in Dr. Trinidad's intake form, Alfonso wrote that "[m]edical transport company service picked me up, but in a car," Trinidad Files at 12.[5]

---

[5] Alfonso doesn't dispute this fact. *See* Defendant's Response to Plaintiff's Statement of Additional Material Facts at 1 (not disputing ¶ 111).

*Third*, Alfonso tries to draw the Court into some logical fallacies. "Broward County law," he notes, "outlines strict measures governing transport vehicles." Response at 5. And, he adds, both Dr. Trinidad and Dr. Eisele testified that "it is not industry standard for medical transport to be provided in luxury sedans and the most common form of transport is vans." *Id.* From these basic propositions, he asks the Court to infer that, since the law and industry practice prohibit the use of luxury sedans, Sunrise must've picked him up in a van.

*Fourth*, Alfonso pushes hard on the testimony of his neighbor, his gardener, and his wife. Let's start with the neighbor, Ron Constantine, who testified that he never saw a van drop Alfonso off. *See* Constantine Dep. [ECF No. 36-1] at 10 ("Q: Did you see the white van pull up and drop Mr. Alfonso off? A: No."). Instead, he explained that, as he was walking out the front of his house, he "saw Ray [Alfonso] just going into his gate, and I went up to see him. When I got up to his point, he had fallen and he couldn't get up. Problem is, I couldn't—I went to him and I couldn't get him up because of the surgery [referring to Constantine's own back surgery]. So we got a landscape guy across the way, and then went back and helped him up and got him into the house. His wife came out and we brought him into the house." *Id.* at 7. As Constantine was walking over, he "saw a white van go by me. I didn't see anything about the—the markings or anything with the license plates, because I was just looking and heard what happened. He [Alfonso] did a face plant and screamed." *Id.* at 9. Constantine described the white van as "just going by—you know, just from the corner of my eye." *Id.* at 10. Constantine never saw a black BMW. *Id.* And, while he was confident that this happened in June of 2016, he couldn't give a more precise date. *Id.* ("I know that it's in June because it was like two, three days before my birthday . . . . Maybe four days. I don't know. Just something around that."). Tab this quote because it's ultimately the most compelling fact Alfonso has adduced—and the one upon which all else depends.

Turning next to the gardener, Jamal Anderson, who testified that:

> I was across the street. I was just cleaning up some palms doing some work and I seen a van come up the street. . . . So, before I could even kind of you know head towards that way, I heard the neighbor up the street run. I heard him call my name, you know. And he sounded kind of frantic when he was calling me. So, you know, I kind of dashed around and you know, as I came across the street because I couldn't really see until I came around because the van was like on the—parked like in front of the driveway. So, you know, by the time I got there, you know, I seen Ron [Constantine] helping Ray [Alfonso]. You know, Ray was on the ground and I went to the door to go and knock on the door to go get his wife, Mary [Rivera], you know so she would come outside[.]

Anderson Dep. [ECF No. 36-2] at 13–14. But Anderson "didn't see him [Alfonso] per say drop off meaning I didn't see him get out of the van. But the van was there. . . . Mr. Ron and Ray was sitting there on the ground. The van took off." *Id.* at 14. Anderson estimated that the van was there for "less than a minute." *Id.* at 21. Anderson wasn't sure if the fall happened in June, July, or August of 2016. *Id.* at 22. ("Q: [C]an you pinpoint the day when this happened, like the—like are you sure it was June 2016, July 2016, or August 2016? A: I can't remember. I'm sorry.").

Finally, Alfonso's wife, Mary Rivera, recalled that, when she "heard hard knocking on the glass, [] I came down the stairs. Because it was very, very hard. And I came down—I ran down the stairs as fast as I could. And I went and I opened the door, and there was Ray hunched over. And Jamal, the guy that does the—the landscaping, he was holding him. At that time, I saw the transport going this way." Rivera Dep. [ECF No. 36-3] at 11. Earlier in her deposition, Rivera had said something slightly different: "And then I saw a van, when he came back, drive off. He tripped, because he was wobbly from the anesthesia." *Id.* at 5–6. When pressed ("Q: How do you know the transport was the same one that had dropped him off?"), she admitted that "Oh, I don't know if it was. But it was white. I don't know if it was the same gentleman that was driving. I never saw the face. I just saw the back of—of the transport." *Id.*; *see also id.* ("Q: Okay. So you don't know for sure that that was the van that Raymond was inside? A: No, I don't."). Rivera was never asked whether the fall happened on June 7, 2016. *See generally* Rivera Dep.

On March 24, 2020, RLI filed its Motion for Summary Judgment. *See* Plaintiff's Motion for Summary Judgment (the "Motion"). Alfonso responded with his own Motion for Partial Summary Judgment. *See* Alfonso's Motion for Partial Summary Judgment.[6] The parties agree that, in June of 2016, Sunrise's insurance policy—issued by RLI—covered only white vans. *See* Pl. SOF ¶¶ 25–32.

## THE LAW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *Id.* at 248. A dispute about a material fact is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party. *Id.* "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

At summary judgment, the moving party bears the initial burden of "showing the absence of a genuine issue as to any material fact." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying

---

[6] Both Motions are fully briefed. *See* Response; Reply in support of RLI's Motion for Summary Judgment (the "Reply") [ECF No. 42]; Response to Alfonso's Motion for Partial Summary Judgment [ECF No. 46]; Reply in Support of Alfonso's Motion for Partial Summary Judgment [ECF No. 48]. N.B. Alfonso attached to his Response the affidavit of a neurologist, Kishner Aff. [ECF No. 36-9], which RLI has moved to strike, *see* Motion to Strike [ECF No. 44]. That Motion to Strike, in turn, is likewise ripe for adjudication. *See* Response to Motion to Strike [ECF No. 49]; Reply in Support of Motion to Strike [ECF No. 53].

those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."). Once the moving party satisfies its initial burden, the burden then shifts to the non-moving party to "come forward with specific facts showing there is a genuine issue for trial." *See Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The Court, in ruling on a motion for summary judgment, "need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3); *see also HRCC, Ltd. v. Hard Rock Cafe Int'l (USA), Inc.*, 703 F. App'x 814, 817 (11th Cir. 2017) (noting that a "court may decide a motion for summary judgment without undertaking an independent search of the record" (quoting FED. R. CIV. P. 56 advisory committee's note)). In any event, on summary judgment, the Court must "review the facts and all reasonable inferences in the light most favorable to the non-moving party." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1265 (11th Cir. 2001).

In sum, then, if there are any genuine issues of material fact, the Court must deny summary judgment and proceed to trial. *Whelan v. Royal Caribbean Cruises Ltd.*, 2013 WL 5583970, at *2 (S.D. Fla. Aug. 14, 2013). On the other hand, the Court must grant summary judgment if a party "has failed to make a sufficient showing on an essential element of her case." *Celotex*, 477 U.S. at 323; *see also Lima v. Fla. Dep't of Children & Families*, 627 F. App'x 782, 785–86 (11th Cir. 2015) ("If no reasonable jury could return a verdict in favor of the nonmoving party, there is no genuine issue of material fact and summary judgment will be granted." (quoting *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 459 (11th Cir.1994))).

## ANALYSIS

### I.      The Motion to Strike

We begin with RLI's Motion to Strike. In his Response to RLI's Motion for Summary Judgment, Alfonso attached an affidavit from a neurologist, Dr. Richard Kishner. *See* Kishner Aff.

Arguing that Alfonso failed to timely disclose Dr. Kishner's expert opinions, RLI has moved to strike Dr. Kishner's testimony under Rule 37.

### A.     The Relevant Facts

In its Original Scheduling Order, this Court set December 17, 2019 as the deadline for expert summaries and reports. *See* Original Scheduling Order [ECF No. 16] at 2. Although the Court has since continued the trial date several times, this expert deadline has remained unchanged. *See* Amended Scheduling Orders [ECF Nos. 16; 32; 58; 59; 62]. Alfonso did not identify Dr. Kishner in his Initial Disclosures. *See* Initial Disclosures [ECF No. 44-1]. Nor had he done so by the December 17, 2019 deadline. *See* Motion to Strike ¶ 8. In fact, Alfonso did not identify Dr. Kishner *at all* until February 4, 2020—six weeks after the expert deadline—when, after learning that Alfonso intended to depose some undisclosed experts, RLI demanded that Alfonso supplement his disclosures. *See* Feb. 3, 2020 Email [ECF No. 44-3]; *see also* Supplemental Disclosures [ECF No. 44-4]. Alfonso obliged and, on February 4, 2020, sent over his Supplemental Disclosures, in which he described Dr. Kishner only as "a neurologist and treating physician of Mr. Alfonso." Supplemental Disclosures at 4. The Supplemental Disclosures went on to say that, "[u]pon information and belief, Dr. Kishner will have knowledge regarding his care and treatment rendered to Mr. Alfonso, as well as general knowledge of the conditions he treated Mr. Alfonso for." *Id.*

The next day, February 5, 2020, Alfonso noticed Dr. Kishner's deposition for April 2, 2020. *See* Kishner Notice [ECF No. 44-5]. On April 1, 2020, though, Alfonso cancelled the deposition, citing the COVID-19 pandemic. *See* Notice of Cancellation [ECF No. 44-6]. And, six days later—on April 7, 2020 (the day *all discovery* closed)—Alfonso attached an affidavit by Dr. Kishner as part of his Response to RLI's Motion for Summary Judgment. *See* Kishner Aff. Alfonso also appended 86 pages of Dr. Kishner's notes—consisting of the records of nineteen separate appointments with Alfonso between April 2013 and December 2017. *See* Kishner Notes [ECF No. 36-4].

Dr. Kishner's notes suggest that Alfonso saw Dr. Kishner irregularly. After starting his treatment in April 2013, Alfonso saw Dr. Kishner 15 times over a 32-month period—roughly once every two months. *Id.* He stopped seeing Dr. Kishner in December 2015 and didn't return until May 2017—an 18-month gap. *Id.* As relevant here, Alfonso did not see Dr. Kishner for almost six months *before* the June 7, 2016 transport, and he didn't go back to Dr. Kishner until more than a year *after* the incident. *See id.*

On the critical question of Alfonso's memory, Dr. Kishner has never wavered. In fact, both before and after the June 7, 2016 incident, Dr. Kishner repeatedly and consistently described Alfonso's memory as "mildly impaired for recent and remote recall." *Id.* at 5, 10, 15, 22, 26, 31, 34, 38, 42, 47, 51, 55, 60, 63, 68, 72, 77, 80. Notably, Dr. Kishner's notes *never* suggest even a trace of postoperative cognitive dysfunction (POCD for short). *See generally id.* Nor do they ever attribute to Alfonso the faintest hint of Alzheimer's, dementia, an increased sensitivity to anesthetics, an enhanced propensity for confabulation, a predisposition for hallucination, or any other tendency—in whatever form—to invent false memories. *Id.*

Until, that is, Alfonso's lawyer noticed him in this case. In his April 2019 affidavit, Dr. Kishner wrote that, "[i]n 2013 . . . I diagnosed Mr. Alfonso with memory loss and impairment." Kishner Aff. ¶ 1. So far, so good. Before executing the affidavit, Kishner "reviewed Mr. Alfonso's anesthesia records from the Park Creek Surgery Center" and noted that "the anesthesiologist utilized versed, diprivan (Propofol) and lidocaine to administer anesthesia." *Id.* ¶¶ 13, 15. And here's where things begin to take a strange turn. Based on his "experience and training as a board certified neurologist treating patients with dementia, Alzheimer's and memory impairments," Dr. Kishner said, "patients with a preexisting cognitive disorder have a higher risk of postoperative cognitive complications than other patients." *Id.* ¶¶ 16–17. Critically, Dr. Kishner opined that "[p]atients with cognitive conditions such as those I diagnosed in Mr. Alfonso will have an increased sensitivity to anesthetics such as

versed, diprivian and lidocaine." *Id.* "As a result," Dr. Kishner added, "patients with conditions like Mr. Alfonso will experience a prolonged recovery period that will significantly impair their ability [sic] judge and recall[.]" *Id.* ¶ 18. "Symptoms," he said, "will typically involve a decline in memory, concentration and information processing. This phenomenon is known as 'postoperative cognitive dysfunction' (POCD)." *Id.* ¶ 19. And so, going back in time, Dr. Kishner surmised that Alfonso "would have experienced severe POCD after his rhizotomy and his ability to recall details about events shortly after the procedure was significantly compromised." *Id.* ¶ 21. The upshot, in Dr. Kishner's view, is that "Mr. Alfonso would fill in the gaps of his compromised memory with details that did not occur." *Id.* ¶ 22.

**B.     The Federal Rules**

"[A] party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705." FED. R. CIV. P. 26(a). Rule 26 distinguishes between retained experts (Rule 26(a)(2)(B)) and non-retained experts (Rule 26(a)(2)(C)). Retained experts must disclose a written report, which must contain "(i) a complete statement of all opinions the witness will express and the basis and reasons for them; [and] (ii) the facts or data considered by the witness in forming them; [subsections iii–v omitted]." FED. R. CIV. P. 26(a)(2)(B). Non-retained experts, by contrast, need not submit a written report—though the lawyer seeking to use a non-retained expert must disclose "(i) the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705; and (ii) a summary of the facts and opinions to which the witness is expected to testify." FED. R. CIV. P. 26(a)(2)(C). The relevant "party must make these disclosures at the times and in the sequence that the court orders." FED. R. CIV. P. 26(a)(2)(D).

"The requirement of a written report in paragraph (2)(B) . . . applies only to those experts who are retained or specially employed to provide such testimony in the case or whose duties as an

employee of a party regularly involve the giving of such testimony. A treating physician, for example, can be deposed or called to testify at trial without any requirement for a written report." FED. R. CIV. P. 26(a)(2)(B) advisory committee's notes (1993). Courts have clarified, though, that "the label of treating physician is irrelevant; instead, the determination turns on the substance of the physician's testimony." *Sweat v. United States*, 2015 WL 8270434, at *2 (M.D. Fla. Dec. 8, 2015). Treating physicians "commonly consider the cause of any medical condition presented in a patient, the diagnosis, the prognosis, and the extent of disability, if any, caused by the condition or injury. But, if a health care professional is asked to give any additional opinions, beyond those procured directly from treatment, then for those additional opinions to be admissible, Plaintiff must first provide the full written disclosures required by Rule 26(a)(2)(B)." *Id.* (cleaned up); *see also Anderson v. City of Fort Pierce*, 2015 WL 11251762, at *2 (S.D. Fla. Apr. 15, 2015) ("In the context of a treating doctor, Rule 26(a)(2)(C) applies if the doctor testifies about opinions formed and observations made during the course of treatment. . . . However, at that point where a treating doctor offers an opinion outside the scope of treatment, he becomes an expert witness, and Rule 26(a)(2)(B) applies."). A treating physician "is simply a fact witness whose opinions and insight are informed by his professional training, experience, and expertise." *Anderson*, 2015 WL 11257162, at *2.

The penalty for not complying with the relevant disclosure requirements is that "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." FED. R. CIV. P. 37(c)(1). "The Supreme Court has clarified that an individual's discovery conduct should be found 'substantially justified' under Rule 37 if it is a response to a 'genuine dispute, or if reasonable people could differ as to the appropriateness of the contested action.'" *Devaney v. Continental Am. Ins. Co.*, 989 F.2d 1154, 1163 (11th Cir. 1993) (quoting *Pierce v. Underwood*, 487 U.S. 552, 565 (1988)).

While Rule 37 doesn't define "harmless," the advisory committee's notes helpfully provide

some (non-exhaustive) examples, including: "the inadvertent omission from a Rule 26(a)(1)(A) disclosure of the name of a potential witness known to all parties; the failure to list as a trial witness a person so listed by another party; or the lack of knowledge of a pro se litigant of the requirement to make disclosures." FED. R. CIV. P. 37 advisory committee's notes (1993). "The examples of harmless non-disclosures set out in the Advisory Committee notes all involve an inadvertent omission of information that was available to the opposing party." *Taylor v. Mentor Worldwide, LLC*, 940 F.3d 582, 603 (11th Cir. 2019) (Julie Carnes, J., concurring) (cleaned up). "In determining whether the failure to disclose was justified or harmless, we consider the non-disclosing party's explanation for its failure to disclose, the importance of the information, and any prejudice to the opposing party if the information had been admitted." *Lips v. City of Hollywood*, 350 F. App'x 328, 340 (11th Cir. 2009).

"Because the expert witness discovery rules are designed to allow both sides in a case to prepare their cases adequately and to prevent surprise, compliance with the requirements of Rule 26 is not merely aspirational." *Reese v. Herbert*, 527 F.3d 1253, 1266 (11th Cir. 2008). The burden of showing substantial justification or harmlessness is on the non-disclosing party. *See Knight through Kerr v. Miami-Dade Cty.*, 856 F.3d 795, 812 (11th Cir. 2017) ("[P]laintiffs thus had at least five months' notice to gather their experts and they have not carried their burden of showing a substantial justification for their tardiness."). More specifically—and as relevant here—the party "seeking to avoid producing full written expert reports" bears the burden of demonstrating that no such report is required. *In re Denture Cream Prods. Liab. Litig.*, 2012 WL 5199597, at *4 (S.D. Fla. Oct. 2012) (Altonaga, J.) ("Although Defendants, as the moving parties, bear the initial burden of showing a valid basis for striking Plaintiffs' disclosures, Plaintiffs, as the parties seeking to avoid producing full written expert reports, bear the burden of demonstrating that Rule 26(a)(2)(B) reports are not required."). A trial judge's decision to impose a sanction under Rule 37 is reviewed for an abuse of discretion. *See Taylor*, 940 F.3d at 593 ("Rule 37 gives a trial court discretion to decide how best to respond to a litigant's failure

to make a required disclosure under Rule 26.'").

### C.   Discussion

### 1.   Timeliness

Alfonso tries to parry the Motion to Strike by calling it "untimely" under Local Rule 26.1(g)(1). *See* Response to Motion to Strike at 4. Under that Rule, "[a]ll disputes related to discovery shall be presented to the Court . . . within (30) days from the . . . (c) date on which a party first learned of or should have learned of a purported deficiency concerning the production of discovery materials." S.D. FLA. L.R. 26.1(g)(1). Since Alfonso disclosed Dr. Kishner as a witness on February 4, 2020, *see* Supplemental Disclosures at 4, he insists that RLI had until March 4, 2020 to move to strike Dr. Kishner's testimony, *see* Response to Motion to Strike at 4. And, because RLI filed its Motion to Strike on April 20, 2020, *see* Motion to Strike, Alfonso contends that the Motion is untimely.

But it wasn't until Alfonso attached Dr. Kishner's affidavit to his summary-judgment Response that RLI became aware of the objectionable portions of his (proposed) testimony. Dr. Kishner's notes, after all, described Alfonso's memory loss only as "mildly impaired for recent and remote recall." Kishner Notes at 5, 10, 15, 22, 26, 31, 34, 38, 42, 47, 51, 55, 60, 63, 68, 72, 77, 80. They never even hint at any Alzheimer's or dementia, an increased sensitivity to anesthetics, POCD, or a tendency to confabulate. *See generally id.* Nor did Alfonso's boilerplate Supplemental Disclosures suggest that Dr. Kishner would say anything more than what was reflected in his notes. Those disclosures, in fact, suggested only that "Dr. Kishner will have knowledge regarding his care and treatment rendered to Mr. Alfonso, as well as general knowledge of the conditions he treated Mr. Alfonso for." Supplemental Disclosures at 4. And we now know why—because, as Dr. Kishner admits in his affidavit, he formulated his POCD opinion only *after* he reviewed Alfonso's Park Creek records. *See* Kishner Aff. ¶¶ 13, 15. These new opinions, then—that Alfonso suffers from POCD, that he was particularly sensitive to surgical analgesics, and that he has a tendency to confabulate—appear for the

first time in the affidavit, which Alfonso submitted on April 7, 2020. Since these are the only aspects of Dr. Kishner's testimony to which RLI objects, the Motion to Strike—filed April 20, 2020—was well within the applicable 30-day window.

### 2.    Dr. Kishner as Retained Expert

"In the context of a treating doctor, Rule 26(a)(2)(C) applies if the doctor testifies about opinions formed and observations made during the course of treatment. . . . However, at that point where a treating doctor offers an opinion *outside the scope of treatment*, he becomes an expert witness, and Rule 26(a)(2)(B) applies." *Anderson*, 2015 WL 1121762, at *2 (emphasis added). For three reasons, Dr. Kishner's opinions about Alfonso's POCD and his supposed tendency to confabulate are "outside the scope of treatment."

*First*, as RLI points out, Dr Kishner's voluminous and detailed records of his interactions with Alfonso *never* "mention POCD." Mot. to Strike at 8; *see generally* Kishner Notes. Nor do they ever suggest that Alfonso suffers from any predilection for "fill[ing] in the gaps of his compromised memory with details that did not occur." Kishner Aff. ¶¶ 21–22. To the contrary, on the subject of Alfonso's memory, the notes repeatedly and consistently say only that it's "mildly impaired for recent and remote recall." Kishner Notes at 5, 10, 15, 22, 26, 31, 34, 38, 42, 47, 51, 55, 60, 63, 68, 72, 77, 80. Dr. Kishner himself, then, never discussed or considered either POCD or a propensity for confabulation as part of Alfonso's treatment.[7]

---

[7] For this reason, even if Dr. Kishner were a treating physician, Alfonso's Supplemental Disclosures would still fail to satisfy the strictures of Rule 26(a)(2)(C). That Rule requires a party to disclose "(i) the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705; and (ii) a summary of the facts and opinions to which the witness is expected to testify." FED. R. CIV. P. 26(a)(2)(C). In the Supplemental Disclosures, Alfonso divulged only that "Dr. Kishner is a neurologist and treating physician of Mr. Alfonso. Upon information and belief, Dr. Kishner will have knowledge regarding his care and treatment rendered to Mr. Alfonso, as well as general knowledge of the conditions he treated Mr. Alfonso for." Supplemental Disclosures at 4. Because Dr. Kishner never treated Alfonso either for POCD or for some purported tendency to

*Second*, Dr. Kishner purports to tell us what was going on inside Alfonso's head on the day of the incident. But Dr. Kishner wasn't treating Alfonso in June of 2016, when the incident occurred. In fact, he didn't see Alfonso at all in the 17 months between December of 2015 and May of 2017. Nor was this gap typical of Dr. Kishner's relationship with Alfonso. After all, in the 32 months between April of 2013 and December of 2015, the two saw each other 15 times—just about every two or three months. Our 17-month gap, then—a gap that (notably) spans the date of our incident—strongly supports RLI's view that Dr. Kishner was not treating Alfonso in June 2016. His newly discovered opinions about what Alfonso was thinking on the day of the incident are thus not those of "a fact witness whose opinions and insights are informed by his professional training." *Anderson*, 2015 WL 112511762, at *2.

*Third*, Dr. Kishner admits that he developed his opinions (in part) through his "review of Mr. Alfonso's anesthesia record" from Park Creek—a record that had nothing to do with his treatment of Mr. Alfonso. Kishner Aff. ¶ 21. In *Hinson v. United States*—the case on which Alfonso principally relies—the Middle District of Florida explained that if, as here, the expert's opinions were "based on information learned outside [the] treatment relationship," they would be inadmissible "because [the expert] failed to provide the full written disclosures." 2019 WL 1745373, at *3 (M.D. Fla. Apr. 18, 2019). Since Dr. Kishner developed his opinions "based on information he learned" from the Park Creek records, Rule 26 required him to submit a written report.

Against all this, Alfonso advances two arguments—both unpersuasive.

*First*, Alfonso contends that "the rules do not contemplate a requirement that physicians must include in their notes every exacerbation of conditions they have already diagnosed in their patients in order to avoid the requirements of Rule 26(a)(2)(B). If that were the rule, physicians would literally be

---

confabulate, this barebones (and now-inaccurate) disclosure cannot overcome even the relatively low bar of Rule 26(a)(2)(C).

limited to the exact words on the pages of their records and any attempt to explain their diagnoses would require additional expert reports in nearly every case." Response to Motion to Strike at 6. But we need not follow Alfonso down the slippery slope he warns us about. No one is suggesting that the question of expertise turns exclusively—or even mostly—on some narrow exegesis of the precise words the expert chose to jot down in his notes. Instead, the question hinges—as it always has—on whether the expert arrived at his opinions through *his own treatment* of the patient. And where, as here, the expert never treated the patient for a particular problem, never diagnosed him with that problem, never prescribed medication or therapy for the problem, never noted the problem anywhere in his notes or discussed it, even obliquely, with anyone (including the patient), it's hard to accept that the expert was "treating" the patient for that problem. Add in the two additional facts we have here— that the expert wasn't treating the patient *at all* when the problem (allegedly) arose, and that the expert admitted to recognizing the problem only years later, when he was asked to review some *other* doctor's medical records, *see* Kishner Aff. ¶ 13—and the question isn't all that close.

*Second*, Alfonso tries to undermine RLI's reliance on *Singletary v. Stops*, 2010 WL 3517039, at *7 (M.D. Fla. Sept. 7, 2010), by noting that, in *Singletary*, "the physician's records made no mention of what plaintiff's job functions were or even state that the plaintiff could not work," Response to Motion to Strike at 7. The physician in *Singletary* was prepared to testify that the plaintiff could no longer perform her job duties. *Singletary*, 2010 WL 3517039, at *6. The court had no trouble calling the physician a retained expert because he had not personally examined the plaintiff and developed his opinion only after reviewing the plaintiff's electronic records. *Id.* at *7. As Alfonso rightly explains, "the physician [in *Singletary*] needed additional information, such as plaintiff's job function, that he did not have and did not obtain from or relate to his treatment of the plaintiff." Response to Motion to Strike at 7. That's exactly right—and it's why Dr. Kishner is likewise a retained expert. As in *Singletary*, Dr. Kishner did not examine Alfonso either in the six months before or the 11 months after the

incident. As in *Singletary*, Dr. Kishner developed his opinions, not from his own treatment of Alfonso—he wasn't even treating Alfonso when the incident occurred—but from a review of the Park Creek medical records. As *Singletary* notes, "a treating physician does not need to submit an expert report if planned testimony was acquired not in preparation for trial, but rather because he was an actor or viewer with respect to transactions or occurrences that are a part of the subject matter of the lawsuit." *Singletary*, 2010 WL 3517039, at *7 (cleaned up). Because Dr. Kishner wasn't an actor or viewer "with respect to" any of the "transactions or occurrences" at issue here—not the incident itself, not the POCD, not even the supposed propensity for confabulation—he was a retained expert.[8]

And, because Dr. Kishner was a retained expert under Rule 26(a)(1)(B), he was required to provide an expert report. *See* FED. R. CIV. P. 26(a)(2)(B) ("[T]his disclosure must be accompanied by a written report . . . ."). It is undisputed that Alfonso *never* served a written report prepared by Dr. Kishner—and so, he "is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." FED. R. CIV. P. 37(c)(1).

### 3.       Substantially Justified or Harmless

"Substantial justification" refers to a "genuine dispute" or situations where "reasonable people could differ as to the appropriateness of the contested action." *Pierce v. Underwood*, 487 U.S. 552, 565

---

[8] Alfonso, it's true, could be saying something slightly more nuanced—that, as Dr. Kishner wrote in his affidavit, his opinions *are* based (in part) on his "treatment of Mr. Alfonso[.]" Kishner Aff. ¶ 21. But that misses the point. Even taking Dr. Kishner at his word, the issue is that he formulated his opinion "*[b]ased on my review of Mr. Alfonso's anesthesia record, and in conjunction with* my treatment of Mr. Alfonso[.]" *Id.* Dr. Kishner's own testimony, in other words, distinguishes between his *treatment* of Mr. Alfonso and his *separate* review of the Park Creek records. The implication is that he wouldn't have rendered these new opinions from his treatment alone precisely because, as his notes reflect, his treatment had nothing to do with the subject of these opinions. And, when a physician—even a treating physician—develops his opinions only by reaching *outside* his treatment regimen and reviewing *external* records that have *nothing* to do with his treatment, those opinions fall neatly into the ambit of Rule 26(a)(2)(B).

(1988). Because Alfonso never suggests that his failure to timely disclose Dr. Kishner's written report was substantially justified, *see generally* Response to Motion to Strike, he has waived any such argument, *see, e.g.*, *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("[T]he failure to make arguments and cite authorities in support of an issue waives it."). The Court must, therefore, exclude Dr. Kishner's testimony unless Alfonso's failure to disclose it was harmless. In support of his harmlessness contention, Alfonso makes three arguments—all unavailing.

*First*, he maintains that RLI could not have been surprised that he would rely on his faulty memory because he had disclosed his memory problems (1) before filing this lawsuit; (2) in his Answer to the Complaint; (3) during this Court's December 2019 status conference; and (4) "after each deposition where the memory impairment was discussed." Response to Motion to Strike at 8. But, again, while RLI may have been on notice that Alfonso had some "mild" memory impairment, it couldn't have known that Dr. Kishner would (later) diagnose Alfonso with POCD, because Dr. Kishner formed this opinion *only after* he reviewed Alfonso's Park Creek records. And, because RLI only saw Dr. Kishner's newly-formulated opinion on the last day of discovery—long after the deadline for expert discovery had passed—this (very) late disclosure was anything but harmless. The tardiness of the disclosure, in fact, successfully precluded RLI from (1) deposing Dr. Kishner about his opinions; (2) questioning Alfonso, his wife, his neighbors, and his friends about his supposed predilection for confabulation; (3) propounding discovery on third-party providers who may (or may not) have ever noticed in Alfonso a tendency to invent reality; or, most fundamentally, (4) hiring its own expert—and preparing its own report—to rebut Dr Kishner's conclusions.[9]

---

[9] As we've said, Alfonso's boilerplate Supplemental Disclosures—in which he explained his intent to depose Dr. Kishner "regarding his care and treatment rendered to Mr. Alfonso, as well as general knowledge of the conditions he treated Mr. Alfonso for," Supplemental Disclosures at 4—couldn't have put RLI on notice of Dr. Kishner's *later* opinion that, for instance, "patients with dementia, Alzheimer's and memory impairments, patients with a preexisting cognitive disorder have a higher

*Second*, Alfonso says that RLI cannot claim surprise both because it chose not to depose Dr. Kishner and because it failed to retain its own neurologist. *Id.* But, again, RLI never thought Dr. Kishner's testimony was in the least bit relevant. What role, after all, could some "mild" amnesia play in this case? Given what it had seen from Dr. Kishner's notes, RLI's counsel quite justifiably elected to save its client some money by neither deposing Dr. Kishner—whose notes, if we're being candid, did RLI no harm—nor hiring an expert to rebut him. And can we blame them? What—let's think on it—would that expert have said? That Alfonso's amnesia is, as Dr. Kishner correctly diagnosed it, quite "mild?" That it was a trifle less than "mild?" RLI cannot be faulted for failing to rebut a witness whose testimony was either helpful to RLI or else not at all probative of anything.

*Third*, and in the alternative, Alfonso asks the Court for leave to amend his disclosures to include the substance of Dr. Kishner's affidavit. *Id.* at 9. Here, Alfonso even requests—weeks after summary-judgment briefs have been filed—that the Court re-open discovery on the issue of Dr. Kishner's new opinions. *Id.* But "compliance with the requirements of Rule 26 is not merely aspirational." *Reese*, 527 F.3d at 1266. Indeed, Alfonso bears the burden of explaining why he failed to disclose Dr. Kishner's opinions, *see Knight through Kerr*, 856 F.3d at 812—a burden he has wholly failed to meet. Nor will the Court reward Alfonso for his brinkmanship. Allowing parties—like Alfonso— to ignore discovery deadlines would undermine the Court's "unquestionable authority" to manage its own docket. *See Smith v. Psychiatric Solutions, Inc.*, 750 F.3d 1253, 1262 (11th Cir. 2014). If Alfonso got his way, there would be nothing federal judges could do to prevent parties from ignoring court orders

---

risk of postoperative cognitive complications than other patients." Kishner Aff. ¶ 16 (fragment in original). Nor could RLI have divined from the barren Supplemental Disclosures Dr. Kishner's *subsequent* position that "[p]atients with cognitive conditions such as those I diagnosed in Mr. Alfonso will have an increased sensitivity to anesthetics such as versed, diprivian and lidocaine." *id.* ¶¶ 16–17. We reiterate: *none* of these later opinions—the only opinions that matter here—can be found anywhere in Dr. Kishner's notes, which indicated only that Alfonso's memory was "mildly impaired for recent and remote recall." Kishner Notes at 5.

with impunity—content in the knowledge that weeks or even months after the close of discovery they could simply move, without prejudice, to resurrect deadlines they had blown long ago.

To sum up, the Court **GRANTS** RLI's Motion to Strike [ECF No. 44] and will not consider any opinions from the Kishner Affidavit that were not previously disclosed to RLI in accordance with the applicable discovery deadlines.

### II.     RLI's Motion for Summary Judgment

This case presents only one question: Could a reasonable juror conclude that, on June 7, 2016, Alfonso was injured in a white van covered by RLI? *Cf.* Pl. SOF ¶¶ 25–32; Def. SOF ¶¶ 25–32 (admitting all facts asserted in the same seven paragraphs of the Pl. SOF except to clarify that, with respect to ¶ 27, "[t]he subject policy covers 28 [rather than 26] transportation vans when considering the changes made to the policy insuring additional vans"). Because the answer to this question is "no," RLI is entitled to summary judgment.

### A.  Alfonso's Own Statements

Let's start with the obvious: there is only one person who can tell us what happened on June 7, 2016—and that's Alfonso.[10] And Alfonso has repeatedly and consistently said—under oath and informally—that, on June 7, 2016, he was transported from Park Creek to his house *in a black BMW*.

In his sworn interrogatory answers, for example—which Alfonso prepared and submitted with the help of the law firm who represents him here, *see* State-Court Interrogatories at 1—Alfonso wrote as follows:

> I was scheduled to be picked up at ParkCreek [sic] Surgery Center in a wheelchair transport after my Rhizotomy procedure. I was not. The Surgery Center staff started to call the Sunrise Transportation service to pick me up. The Surgery Center had to

---

[10] Presumably, there are some others: Sunrise's owner, for example; the Park Creek nurse who helped Alfonso into the car; maybe even someone at Sunrise who logged Alfonso's ride. But, for reasons passing understanding, none of these other people was deposed—and none submitted an affidavit. So, as a matter of record in this case, there is only one person who can testify, first-hand, to what happened on June 7, 2016.

call repeatedly to send someone to pick me up and they were constantly told that
someone was on their way, which did not happen. Eventually[,] a gentleman at the
surgery center called the transport service and had to get very stern with them in
regards to picking me up. After waiting so long eventually a man came into the surgery
center after 5:00 pm and said he was there to pick me up.

*He drove a black BMW which had the odor of pot and liquor.* As he drove me home it was
raining at this point and he was repeatedly on the phone and was angered and raising
his voice as he cursed in Spanish to whomever he was speaking with.

*Id.* at 3–4 (emphasis added). Alfonso, in other words, was pellucid: he was transported in a black

BMW. This was no mere typo. In response to a different interrogatory, Alfonso—with the help of

counsel—swore that "I was scheduled to be picked up at ParkCreek [sic] Surgery in a wheelchair

transport. I was not. A black BMW driven by a person who was driving near twice the speed limit and

resulted in my injuries as described . . . above." *Id.* at 4. "No," Alfonso attested, answering yet a third

Interrogatory, "I was unable to wear a seat belt. I asked the driver several times to assist me with

putting on my seat belt. The BMW seat was low and when I attempted to put the seat belt on, the

driver was driving so fast and swerving making it impossible to fasten the seat belt." *Id.* at 22.

Ten months later, at trial, Alfonso swore an oath to the tell the truth, looked towards the

jurors, and told precisely the same story. Remember, here, that Sunrise had defaulted (at least as to

liability) before trial—so the quantum of damages was the only question the jury was asked to answer.

*See* Def. SOF ¶ 64. Alfonso thus did not have to describe the *kind* of car he was in—only the extent

of the damages he'd suffered. But he did so anyway. Led by counsel, he testified—unequivocally—

that there was no van, white or otherwise. *See* State-Court Trial Tr. at 10. As he explained:

*There was no transport ever.* It was a vehicle that belonged to the owner, director of Sunrise
Transportation. Their vehicles were in use. *And he was driving a very late model, very
expensive BMW.* And when I went into *the car* there was a seat belt down and a seat belt
up, and the one on the down never got to me, and the one on the up was locked. . . .
[The driver] kept on speaking in Spanish to a group of I guess people working for him,
and he was very upset that things were running late because the surgery center was
closed. When he came, I was the last patient out of Park Creek Surgery Center that
day, and they kept on calling Sunrise trying to make them pick me up. And the medical
transport that had picked me up in the morning, I guess was busy and there was no

medical transport, I guess. I'm not sure . . . . I was picked up in *a late model BMW* that seem to be his, the owner's.

*Id.* at 10–11, 15 (emphasis added).

"Solemn declarations in open court carry a strong presumption of verity." *Blackledge v. Allison*, 431 U.S. 63, 74 (1977). And RLI has much to support this presumption. Alfonso, as it turns out, repeatedly told his doctors that he was injured in a car, not a van. In fact, on July 21, 2016, just six weeks after the incident, long before any lawsuit was filed—long before Alfonso's lawyer got involved with his case—Alfonso wrote on Dr. Ruggiero's Intake Form that "I was released from Park Creek Surgery Center to a medical transport service of my insurance co preferred care (United Health). The Driver picked me up *in a BMW 5* and drove over 90 MPH over speed bump. The *car* crunched [sic] down on me and we went up in the air and landed at the next speed bump." Ruggiero Intake Form (emphasis added). Two weeks later, on August 5, 2016, Alfonso wrote in Dr. Trinidad's intake form that "medical transport service picked me up *but in a car*[.] [D]rove over 70 MPH over speed bump + injury occurred." Trinidad Files at 12 (emphasis added). And, on June 12, 2017, Alfonso told his chiropractor that "I was to be picked up from Park Creek Surgery Center (PCS) in a wheel chair med transport. PCS kept calling United Ins Transport Dept to pick me up since this was a day surgery center. Someone *in a car* picked me up and drove me home at speeds up to 90 mph. The driver hit a speed bump, lost control and was remove by neighbor." Eisele Intake Form (errors in original) (emphasis added).

Even as we sit here today, Alfonso—the only person who can tell us *where he was* on June 7, 2016 when he was injured—has not recanted any of this testimony. *See generally* Docket. In other words, he's never suggested—not in a deposition, not in an affidavit, nor even in an unsworn declaration—that his prior consistent testimony in the state-court case was (even to the slightest degree) wrong. His own sworn allegations thus stand entirely unrebutted—and they doom his case here.

### B.  Alfonso's New Strategy

To try to parry the weight of his own statements, Alfonso submits four kinds of evidence: (1) opinions about his failing memory; (2) certain hearsay statements; (3) some irrelevant evidence of law and custom; and (4) the testimony of his own wife, his neighbor, and his gardener. We address each in turn.

### 1.  Alfonso's Mild Memory Issues

*First*, Alfonso says that he suffers from memory loss and that his "ability to recall details about events shortly after his surgery was significantly compromised." Response at 4. More probative here, Alfonso's lawyer writes that "[Alfonso] would fill in the gaps of his compromised memory with details that did not occur." *Id.* But, while Alfonso has adduced *some* evidence of his failing memory, he has *no proof* of this alleged tendency to "confabulate." Response at 2. In fact, the only evidence that even touches on some supposed predilection for "fill[ing] in the gaps," Kishner Aff. ¶ 22, was Dr. Kishner's affidavit, which the Court has stricken and will not consider. With Dr. Kishner gone, Alfonso relies on three pieces of additional evidence—all inapposite.

*One*, he points to a five-sentence letter, written by Eisele, his chiropractor, in February 2018 (some twenty months after the incident), which described Alfonso as "having some mild speech impairments and mild memory loss." Eisele Letter. In the letter, Eisele added that "at this time due to several procedures and his high medication levels he is not able to do paperwork or make any business decisions." *Id.* According to the letter, Eisele began treating Alfonso in June of 2017 (one year after the incident) and noticed "I think there was a point, I don't know how long later, that he was getting, can I say crazy in the head?" Eisele Dep. at 20. But, in his deposition, Eisele admitted that he was not a neurologist, that he did not treat patients for memory impairments, and that he had no medical expertise in psychology, neurology, dementia, or *any* other category of neurocognitive issues. *Id.* at 21, 65. More importantly, he testified that Alfonso always showed up to his appointments, *id.* at 27, and

that he had never known Alfonso to hallucinate or confabulate, *id.* at 60–61. Eisele, then, testified only that Alfonso has some memory problems—an uncontroversial proposition with which RLI doesn't seem to quibble. But he never said—and his letter never suggests—that Alfonso suffers from some tendency to invent memories that never happened. Eisele thus doesn't support Alfonso here.

*Two*, Alfonso relies on the notes of a neurologist, Dr. Po-Heng Tsai. *See* Response at 4. When Alfonso visited Dr. Tsai in January of 2017, Dr. Tsai recommended that Alfonso "do a neuropsychological evaluation to better assess your memory issues." Tsai Notes. But, again, this one line from Dr. Tsai's notes—in which Dr. Tsai asked Alfonso to have his memory checked—proves absolutely nothing. Even if the notes showed that Alfonso had memory problems—something RLI doesn't dispute—the notes never suggest (nor could they be read as suggesting) that Dr. Tsai believed Alfonso suffered from some tendency to confabulate. And, since Alfonso decided—for his own reasons—not to depose (or propound further discovery on) Dr. Tsai, the record contains no other evidence of Dr. Tsai's views on this, or any other, question. To suggest, in other words, that this partial extract from Dr. Tsai's notes raises a genuine issue of material fact with respect to whether Alfonso invented his BMW story is to engage in pure, untethered speculation.

*Three*, Alfonso references one line of Dr. Trinidad's deposition. In response to the question "Would it surprise you as a physician to know that Mr. Alfonso has memory issues?" Dr. Trinidad replied only that "I have seen him have cognitive decline since the time I've known him." Trinidad Dep. at 18; Response at 4. Nowhere, however, does Dr. Trinidad even so much as hint at some purported predilection for confabulation.[11] Dr. Trinidad, therefore, doesn't undermine the strength of Alfonso's own testimony.

---

[11] Dr. Trinidad admitted that she first met Alfonso in August of 2016—two months *after* the incident. *See* Trinidad Dep. at 11.

Even together, these three witnesses don't help Alfonso. "Memory issues," even "cognitive decline," aren't synonymous with "making up false memories." Alfonso, recall, never testified that he *didn't remember* the incident. To the contrary, he repeatedly testified, in great detail, about the events leading up to his injury—testimony that, remember, was perfectly consistent with his earlier statements to his doctors. To raise a genuine issue of material fact about the kind of car he was in, therefore, Alfonso needed evidence of his supposed tendency to confabulate. But, aside from Dr. Kishner's affidavit—which this Court has stricken for lack of compliance with Rule 26—he's adduced no such evidence; and so, he's marshalled no genuine issue of material fact on that crucial question. *Cf. Moody v. Physicians Mut. Ins. Co.*, 789 F. App'x 777, 781 n.6 (11th Cir. 2019) (affirming grant of summary judgment where, after the district court struck an expert witness's affidavit under Rule 26, the plaintiff "failed to present any other competent evidence that contradicted Physician Mutual's showing that [the plaintiff's] wife's death was not accidental").

### 2. Inadmissible Hearsay

*Second*, Alfonso half-heartedly relies on two pieces of inadmissible hearsay. *See* Response at 4. "The general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment[.]" *Macuba v. Deboer*, 193 F.3d 1316, 1323 (11th Cir. 1999). That said, "[s]ome courts, including our own, appear to have restated the general rule to hold that a district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be 'reduced to admissible evidence at trial' or 'reduced to admissible form.'" *Id.* (quoting *Wright v. Southland Corp.*, 187 F.3d 1287, 1304 n.21 (11th Cir. 1999) (cleaned up)).

The first piece of hearsay evidence is the EOB Alfonso's health insurer mailed him, which indicates that United—the insurer—reimbursed Sunrise for a "Nonemergency transportation: wheelchair van." Response at 4 (quoting EOB at 6). But there are two problems with this document. To begin with, as RLI points out, Alfonso hasn't shown that the EOB qualifies as a business record

under FED R. EVID. 803(6). *See* Motion at 6. Alfonso *never responds* to this argument, *see generally* Response—which is reason enough to exclude the EOB. *See Case*, 555 F.3d at 1317 ("A party cannot readily complain about the entry of a summary judgment order that did not consider an argument they chose not to develop for the district court at the time of the summary judgment motions."). And it's true that Alfonso has failed to show that the EOB "was made at or near the time by—or from information transmitted by—someone with knowledge"; that it "was kept in the course of a regularly conducted activity of a business"; or that "making the record was a regular practice of that activity." FED R. EVID. 803(6). Nor (it goes without saying) has he established any of these facts "by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification." *Id.*

Recognizing the law in this Circuit—which requires Alfonso to show only that the EOB "could be reduced to admissible evidence at trial," *Macuba*, 193 F.3d at 1323 (cleaned up)—the Court would be willing to ignore Alfonso's waiver. But there's a second, more intractable problem with the EOB. Even if Alfonso had responded to RLI's hearsay contentions—and even assuming that he could reduce the EOB to admissible form—he could only ever introduce the EOB to show that United paid Sunrise for the transport. *See Smith v. Philadelphia Am. Life Ins. Co.*, 2010 WL 11507274, at *13 (M.D. Ga. Jan. 29, 2010) (finding an EOB admissible to show *the costs* the plaintiff incurred). That, however, doesn't help Alfonso much, because what he really wants is the part of the EOB that describes the service United paid for: a "wheelchair van." EOB at 6. And this second, relevant portion of the EOB is plainly hearsay within hearsay. The United employee, after all, could only have learned about the mode of transport by calling (or emailing) Sunrise and asking. Sunrise's response—which the United rep plugged into the EOB—is thus hearsay within hearsay. *See United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1278 (11th Cir. 2009) ("Hearsay within hearsay subject to an exception is not admissible. . . . In other words, placing otherwise inadmissible hearsay statements by third-parties into a government

report does not make the statements admissible." (cleaned up)). Since Rule 805 requires the Court to find a hearsay exception for *every* layer of hearsay, *see* FED. R. EVID. 805 ("Hearsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule."), the EOB would be inadmissible—even if Alfonso hadn't waived the point.

The second bit of hearsay comes from Dr. Trinidad's testimony, where she said that "[Alfonso] told me that he had—he was being transported home from a pain management, I believe appointment, and that he was in a van that went over, like, a bump—something that caused him to fly up in the air . . . and land hard." Trinidad Dep. at 11. But Alfonso's out-of-court statement to Dr. Trinidad—offered to prove the truth of the matter contained in the statement—is hearsay. And Alfonso wisely doesn't contend that the statement is admissible as a "Statement[] Made for Medical Diagnosis or Treatment" under Rule 803(4), because Dr. Trinidad herself admitted that whether the injury occurred in a car or a van is entirely irrelevant to her diagnosis and treatment. *See* Trinidad Dep. at 51 ("Q: So every detail of your care and treatment would be the same whether he is in a BMW or whether he is in a medical transport van? A: True.").[12]

---

[12] Dr. Trinidad's notes—in which she later reduced what (she says) Alfonso told her to writing, *see* Trinidad Notes; JFK Operative Report [ECF No. 36-15]—are inadmissible for the same reason. None of this, of course, prevents RLI from using Dr. Trinidad's intake form, in which Alfonso, by his own hand, described his injury as stemming from a "rozodmy [sic] performed at Park Creek Surgery Center. Medical transport company service picked me up, but in a car[.] Drove over 70 MPH over speed bump and injury occurred." Trinidad Files at 12. When it comes to the intake form, *RLI* is seeking to introduce *Alfonso's* handwritten statement, so the intake form comes in as the statement of a party opponent. *See* FED R. EVID. 801(d)(2). Nor could Alfonso argue that Dr. Trinidad's recollection (and notes) should be admitted under the rule of completeness. Under that rule, "[i]f a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time." FED. R. EVID. 106. But Alfonso's oral statement to Dr. Trinidad isn't part of the intake form—and thus, it isn't necessary to "explain, qualify or place [it] into context[.]" *United States v. Santos*, 947 F.3d 711, 730 (11th Cir. 2020); *see id.* ("Rule 106 'permits introduction only of additional material that is relevant and is necessary to qualify, explain, or place into context the portion already introduced.'" (quoting *United States v. Simms*, 385 F.3d 1347, 1359 (11th Cir. 2004)). In either event, by failing to argue that Dr. Trinidad's recollection should be admitted under the rule of completeness, *see*

### 3.  Law and Custom

*Third*, noting that "Broward County law . . . outlines strict measures governing transport vehicles," Alfonso maintains that Sunrise couldn't have picked him up in a BMW. Response at 5. But, just as the Broward County speed limit didn't prevent Sunrise's owner from speeding—a proposition Alfonso's lawyer has never disavowed—the County ordinance against moving patients in personal cars needn't have prevented that same owner from driving Alfonso in his BMW. Indeed, given Alfonso's detailed testimony about the owner's lack of compliance with other, more serious safety ordinances—he was, after all, speeding while yelling on the phone in a car that reeked of marijuana smoke and alcohol—it's hard to see why the Broward "law" in question would have influenced the owner's behavior. We wouldn't allow a defendant in a murder trial to cite the homicide statute as evidence that he couldn't have committed the murder—and we won't allow Alfonso to point to a Broward County ordinance as proof that Sunrise's owner couldn't have picked him up in a BMW. One thing has absolutely nothing to do with the other.

Alfonso's use of industry "standard" evidence fares little better. As Alfonso explains, both his chiropractor (Eisele) and his neurologist (Dr. Trinidad) testified that "it is not industry standard for medical transport to be provided in luxury sedans and the most common form of transport is vans." Response at 2. As he does with the Broward County ordinance, however, Alfonso then uses this "custom" evidence to try to prove that, because transporting patients in BMWs contravenes industry norms, Sunrise couldn't have picked him up in a BMW. *See* Response at 5. Here, again, he attempts too much. While expert witnesses may testify about industry standards and customs, they may do so *only to establish* the standard or custom—not to prove one's *conformity* with that custom. So, for instance,

---

*generally* Response, Alfonso has waived any such argument, *see Case*, 555 F.3d at 1329 ("A party cannot readily complain about the entry of a summary judgment order that did not consider an argument they chose not to develop for the district court at the time of the summary judgment motions.").

an expert on, say, roofing or the appropriate level of medical training for health club employees may

describe the relevant standard in that field. *See, e.g.*, *Ins. Co. of the West v. Island Dream Homes, Inc.*, 679

F.3d 1295, 1298 (11th Cir. 2012) ("[The plaintiff] was required to present evidence on the standard of

care in the roofing industry—either by expert testimony or by presenting testimony of roofing custom.

Expert testimony is required to define the standard of care when the subject matter is beyond the

understanding of the average juror."); *L.A. Fitness Intern., LLC v. Mayer*, 980 So. 2d 550, 558 (Fla. 4th

DCA 2008) ("At trial, appellee presented expert testimony about health club industry standards and

recommendations regarding CPR. Although the custom and practice of an industry can help define a

standard of care a party must exercise after it has undertaken a duty, industry standards do not give

rise to an independent legal duty.").

So, if Sunrise had defended itself in the state-court trial, Alfonso could have used expert

testimony to establish an industry standard of using only company vans—rather than personal

BMWs—to transport patients. *See Sorrels v. NCL (Bahamas) Ltd.*, 796 F.3d 1275, 1282 (11th Cir. 2015)

("[E]vidence of custom within a particular industry, group, or organization is admissible as bearing on

the standard of care in determining negligence." (cleaned up)). He then could have argued that

Sunrise's failure to comply with that standard evidenced its negligence.[13] *See id.* ("Compliance or

---

[13]     Alfonso never suggests that this custom evidence might be admissible as evidence of habit.
*See generally* Response. He has thus waived any such argument. *See Case*, 555 F.3d at 1329 ("A party
cannot readily complain about the entry of a summary judgment order that did not consider an
argument they chose not to develop for the district court at the time of the summary judgment
motions."). Even had he done so, though, he would have failed to meet the very high bar Rule 406
sets for habit evidence. "Rule 406 provides in pertinent part that 'evidence of the routine practice of
an organization is relevant to prove that the conduct of the organization on a particular occasion was
in conformity with the routine practice." *Goldsmith v. Bagby Elevator Co., Inc.,* 513 F.3d 1261, 1285 (11th
Cir. 2008) (quoting FED. R. EVID. 406 (cleaned up)). "A habit, on the other hand, is the person's
regular practice of meeting a particular kind of situation with a specific kind of conduct, such as the
habit of going down a particular stairway two stairs at a time, or giving the hand signal for a left turn,
or of alighting from railway cars while they are moving. The doing of the habitual acts may become
semi-automatic." *Loughan v. Firestone Tire & Rubber Co.*, 749 F.2d 1519, 1524 (11th Cir. 1985). A

noncompliance with such custom, though not conclusive on the issue of negligence, is one of the factors the trier of fact may consider in applying the standard of care."). In response, Sunrise might have quibbled with the way Alfonso's experts had defined the appropriate standard—or it could have shown that it complied with that standard. But it could not call an expert to say that the standard's *mere existence* precluded its violation. That would have been illogical. "If men were angels,"[14] perhaps, proof of the standard would establish compliance. But people violate norms and standards all the time—that's what tort law is for. In fact, taken to its logical conclusion, the argument would undermine Alfonso's whole state-court case. In state court, after all, Alfonso argued that Sunrise had violated the standard of care. But, if we accept Alfonso's premise here—that the mere existence of a standard is relevant to the separate question of whether the standard was violated—then it may well follow that Sunrise couldn't have been negligent in the underlying case because a finding of negligence would suggest that Sunrise had violated industry practice. And this, of course, is a conclusion Alfonso very much hopes to avoid. Because Alfonso's industry-practice evidence is irrelevant to the only question at issue here—whether Sunrise picked him up in a white van or a black BMW—the Court will not consider it.

---

proponent of habit evidence "must show that the conduct occurred so often that it permits an inference of systematic conduct." *United States v. Aguirre*, 368 F. App'x 979, 990 (11th Cir. 2010).

    Alfonso hasn't shown either that the standard of using a company van is systemic or that transporting patients in company vans is the kind of "semi-automatic" behavior that would qualify as habit evidence. Nor could he. His wife, after all, testified that the medical-transport companies she used sometimes transported him by Lyft—rather than by a company van. *See* Rivera Dep. at 9 ("I consider it Preferred Care Transportation. In my phone book it's called Preferred Care Transportation. So whenever I do call, that's the number—the number I would call; Preferred Care Transportation. Later on, because of what happened, we find out it's Sunrise Transportation. But like you said, there's multiple transportation companies that they use. They even use Lyft as a transportation company.").

[14] The Federalist No. 51 (James Madison).

### 4. **The Fall**

*Fourth*, and finally, Alfonso tries to discredit his own sworn testimony by pointing to the depositions of three witnesses: his neighbor (Ron Constantine), his landscaper (Jamal Anderson), and his wife (Mary Rivera). Response at 2–4. Lay witnesses may testify about things they personally observed. *See United States v. Chkuaseli*, 732 F. App'x 747, 759 (11th Cir. 2018) ("A lay witness may testify to firsthand knowledge based on his observations."). They may also proffer opinions that are "rationally based" on their perception. FED. R. EVID. 701 ("If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is (a) rationally based on the witness's perception[.]"). What they may not do is speculate. *See Dunn v. Stewart*, 791 F. App'x 879, 882 (11th Cir. 2019) ("Likewise, the district court did not abuse its discretion when it excluded as speculative the testimony regarding whether Mr. Stewart would still press charges against the Dunns if he could go back in time."); *United States v. Freeman*, 498 F.3d 893, 905 (9th Cir. 2007) ("It is necessary that a lay witness's opinions are based upon direct perception of the event, are not speculative, and are helpful to the determination of factual issues before the jury." (cleaned u)p); *United States v. Gadson*, 763 F.3d 1189, 1207 (9th Cir. 2014) ("On the other hand, an officer's testimony interpreting recorded conversations may fall outside the scope of Rule 701 if it is not based on the witness's perception (for example, if it is based on speculation or hearsay) or is not helpful to the jury."). With that framework in mind, let's review the witnesses' testimony.

Rivera doesn't help Alfonso much. She didn't see Alfonso arrive in, or get out of, any white van. *See* Rivera Dep. at 6. In fact, because she was upstairs when the fall occurred, she never even saw Alfonso anywhere near a white van. *See* Rivera Dep. at 11. She came downstairs only after she heard a "hard knocking on the glass," and she opened the door to find her neighbor (Constantine) supporting her husband (Alfonso). *See* Rivera Dep. at 11. It was only at this point that Rivera says she saw "the transport going this way." *Id.* When asked "[s]o you don't know for sure that that was the

van that Raymond was inside?" Rivera candidly answered: "No, I don't." *Id.* at 6. Most importantly, Rivera never said when the incident occurred, *see generally* Rivera Dep.—which is important because Alfonso fell on *at least* three other occasions in July and August of 2016, *see* Ruggiero Clinic Communication Log; Ruggiero Email. He fell the first two times on July 31, 2016. We know this because, on August 1, 2016, he called the Ruggiero Clinic and said that "he fell twice yesterday and needed help getting up." Ruggiero Clinic Communication Log. The next day—Tuesday, August 2, 2016—he fell again. We know about this fall because, two days later, on August 4, 2016, he sent Ruggiero an email, in which he wrote that "I fell again Tuesday [August 2, 2016], this time outsied bu mial box. a neighbor attmpted to pick me up but had to get 2 lawn works to carry me back in the house. i stayed in bed yesterday and wll go to dr Trinidad tomorrow. I am soaked with urine all the time." Ruggiero Email (errors in original).

Anderson is only marginally more helpful. He's the landscaper who was working across the street when he heard Constantine—the neighbor—call out for help. But Anderson didn't see Alfonso get into or out of a white van. *See* Anderson Dep. at 14 ("I didn't see him per say drop off meaning I didn't see him get out of the van."). When he approached Alfonso's house, he saw a van—he never describes the color—parked in front of the driveway. *Id.* The van was wholly unremarkable—and nothing about it suggested, at least to the best of Anderson's recollection, that it was a Sunrise van. *See id.* at 19–20 ("I mean, you know this is South Florida. You have a lot of these vans riding around that does transportation for people. So for me, it's just—it's just another car. It's just another you know van, whatever driving around. There's nothing in particular that stuck out to me about it. It's just—it was an average van, transportation van."). Most notably, Anderson—like Rivera—couldn't remember when the fall occurred, except to say that it must have been in either 2015 or 2016. *Id.* at 22. Again, this is problematic for Alfonso because we know that he fell on *at least* three other occasions in 2016. *See* Ruggiero Clinic Communication Log; *see also* Ruggiero Email. In the last of these, as we've

shown, he had to be helped up by his neighbor and (he says) two gardeners. *See* Ruggiero Email. And, while Anderson testified that he works alone, *see* Anderson Dep. at 12, the evidence does support RLI's view that Alfonso fell in front of his home with some regularity. So, without any evidence that the fall these witnesses are describing occurred on June 7, 2016, there's no reason to see the fall defense—with its emphasis on the parked van—as inconsistent with Alfonso's testimony that, on June 7, 2016, he was transported in a black BMW.

Which brings us to Constantine (the neighbor)—by far, the strongest piece of evidence Alfonso has submitted. If Alfonso were to survive summary judgment, in fact, it would be on the strength of Constantine's testimony that the sidewalk fall happened *at some point* in June. *See* Constantine Dep. at 10. So, let's review Constantine's testimony in some detail. Like Rivera and Anderson, Constantine never saw Alfonso get into a white van at Park Creek, ride in a white van, or get out of a white van. *Id.* at 10. ("Q: Did you see the white van pull up and drop Mr. Alfonso off? A: No."); *id.* at 13 ("Q: So you are not able to say that a white van dropped off Mr. Alfonso? A: No. I didn't see him get out."). Instead, Constantine was going out for a walk when he heard Alfonso cry out. He turned and "went up to see him. When I got up to his point, he had fallen[.]" *Id.* at 7. Constantine vaguely recalled a van "just going by—you know, just from the corner of my eye." *Id.* at 10. But, because he was recovering from his own surgery, Constantine couldn't help Alfonso up by himself. *Id.* at 7. So, he called out to Anderson who came over from across the street and, together, they carried Alfonso into the house. *Id.* And, while Constantine couldn't remember exactly when the fall occurred—here's the critical piece, the one fact on which the motions for summary judgment turn—he did insist that it must have happened in June, a few days before his birthday. *Id.* at 10 ("I know that it's in June because it was like two, three days before my birthday . . . maybe four days. I don't know. Just something around that."). Unfortunately, since no one thought to ask him when his birthday is, we have *no idea* when in June this fall occurred. *See generally* Constantine Dep.

When it comes to the fall, then, we can go one of three ways—only one of which allows us to accept all the evidence as true and without contradiction. The first possibility is that the fall occurred on August 2, 2016. This would make sense given Alfonso's email of August 4, 2016, in which he said that his neighbor and *two* gardeners had helped him up off the sidewalk and brought him home. *See* Ruggiero Email. But finding that the fall occurred in August would require us to ignore Constantine's testimony that it happened in June—something the Court, at summary judgment, may not do. *See Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict.").[15]

The second possibility—the only one Alfonso pushes here—is that the fall occurred on June 7, 2016, the day of Alfonso's surgery. But there are any number of problems with this theory. To begin with, no one has said so. No one—not Alfonso or Rivera or Constantine or Anderson—has testified that the fall occurred on June 7, 2016. No one, in fact, has said anything close—some hint or oblique reference from which the Court *might* infer that the fall occurred on June 7, 2016. So, for instance, no one has testified that the fall occurred on the same day as Alfonso's surgery—a strange omission indeed. Alfonso, after all, testified at great length about the many terrible things that happened on June 7, 2016—including the surgery, the delayed transport, the smelly BMW, the too-low seatbelts, the screaming driver, the rainy afternoon, the bumpy car ride, and the many travails that followed. *See generally* State-Court Trial Tr. Nowhere, however—not in their interrogatory answers or deposition testimony, not in Alfonso's statements to his doctors or even in his trial testimony—did either Alfonso or his wife mention a fall on June 7, 2016. And we know from their testimony—not to mention these two lawsuits—that both the fall and the surgery were memorable events in the life of the family. So,

---

[15] It would also require us to disregard Anderson's testimony that he always works alone. *See* Anderson Dep. at 12.

the only inference we can draw from the fact that neither Alfonso nor Rivera have connected the two—not then and certainly not now—is that the two *aren't connected*. There's also no independent evidence of the fall happening that day. Unlike the August fall, for example, there's no email or phone call log describing a fall on June 7, 2016. Finally, finding that the fall happened on June 7, 2016—and concluding that Alfonso fell after alighting the van Anderson saw parked in front of the driveway— would directly contradict Alfonso's (un-retracted) sworn trial testimony, his interrogatory answers, and the many statements he made to his doctors, in which he was pellucid that Sunrise transported him on June 7, 2016 in a black BMW. Again, at summary judgment, the Court may not weigh the evidence or settle credibility disputes.

The third possibility is that Alfonso—who, as we've seen, fell rather often in front of his house—fell on some *other* day in June. Only this third possibility synthesizes all the evidence without forcing the Court to blind itself to Alfonso's testimony, to invent a non-existent connection between the transport ride and the fall, or to pick one person's testimony over another. It may even be that, before this *other* June fall—whenever it was—Alfonso was dropped off by a transport van. That van (it's true) *may* have belonged to Sunrise or, no less likely, it *may* have belonged to some other transportation company. As we've seen, Rivera testified that Preferred Care Transportation sub-contracted with many different transport companies to drive her husband around. *See* Rivera Dep. at 9. And she was clear that these companies, which included Sunrise, sometimes transported her husband in white vans—sometimes in other vehicles. *Id.* The evidence is equally clear that Alfonso fell often; that one of his falls happened in June; that, on June 7, 2016, he was dropped off at his house by a black BMW, not a van; and that, after he came back from Park Creek on June 7, 2016, according to his own version of events, there was no fall. *See generally* State-Court Interrogatories; State-Court Trial Tr. Only this third possibility, in short, integrates *all* the evidence.

At summary judgment, of course, the Court must draw all reasonable inferences in the non-movant's favor. *See Pennington*, 261 F.3d at 1265. But, in so doing, the Court may not weigh the evidence or make credibility judgments. *See Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict."). And, while the Court *may* "stack inferences," *Berbridge v. Sam's East, Inc.*, 728 F. App'x 929, 932 (11th Cir. 2018),[16] "a reasonable inference" is one that "a reasonable and fair-minded [person] in exercise of impartial judgment might draw from the evidence," *id.* at 932. In other words, "a jury cannot be allowed to engage in a degree of speculation and conjecture that renders its finding a guess or mere possibility. Such an inference is infirm because it is not based on the evidence." *Id.* (internal quotations omitted).

In our case, Alfonso asks the Court to stack three inferences—each based on "a degree of speculation and conjecture" which would "render [a] finding [for Alfonso] a guess or mere possibility." *Id.* (cleaned up). *First*, Alfonso asks the Court to infer that the fall Constantine, Anderson, and Rivera described occurred on June 7, 2016. As we've seen, however, there's no evidence for this proposition. In fact, the only evidence we do have about June 7, 2016—from Alfonso's testimony, his interrogatories, and his statements to his doctors—makes no mention of any fall happening that day. And, no less problematic, the only evidence we have of falls is indisputably of falls that happened *on other days.*[17] *Second*, Alfonso asks the Court to infer that he was inside the van Constantine, Anderson, and Rivera saw. The problem with this, of course, is that no one ever testified that he was in that van. Alfonso, as we've established, testified repeatedly that he was in a black BMW. And none of the other

---

[16] (noting that "the district court appears to have erred in applying the state-law rule against stacking inferences . . . ." (internal quotations omitted)).

[17] So, for instance, we have hard evidence of two falls on July 31, 2016 and documented evidence of a third fall on August 2, 2016.

witnesses to the fall ever saw him in, or getting out of, that van. *See* Constantine Dep. at 13 ("Q: So you are not able to say that a white van dropped off Mr. Alfonso? A: No. I didn't see him get out."); Anderson Dep. at 14 ("I didn't see him per say drop off meaning I didn't see him get out of the van."); Rivera Dep. at 11 ("Q: So you don't know for sure that that was the same van that Raymond was inside? A: No, I don't."). *Third*, Alfonso urges the Court to infer that the van Constantine, Anderson, and Rivera saw was owned by Sunrise and insured by RLI. Again, however, he has no evidence for this supposition. No one testified that the van resembled a Sunrise van or that it bore any Sunrise markings. Indeed, despite having over a year to take discovery, Alfonso hasn't produced a single document showing the vehicle's license plate, its VIN number, or even its make and model. And Rivera was clear that, during her husband's convalescence, he was sometimes transported by vans belonging to *other* companies. *See* Rivera Dep. at 9.

In sum, even if we assume that the fall happened on June 7, 2016, there's no evidence that Alfonso was ever in the van Rivera, Anderson, and Constantine saw. Worse, even assuming that the fall happened on June 7, 2016—and presuming further that Alfonso had been inside the van—there's no evidence either that the van belonged to Sunrise or that it was insured by RLI.

### C.  What's a Scintilla?

At best, then, Alfonso has adduced no more than a "scintilla of evidence." The Eleventh Circuit has repeatedly deployed this standard to affirm summary judgment in cases where the plaintiff has adduced (arguably) more and stronger evidence than Alfonso has submitted here. So, for example, in *Ship Constr. and Funding Servs., Inc. v. Star Cruises, PLC*, the plaintiff had brokered a deal between two cruise-ship companies to purchase Norwegian Cruise Lines ("NCL"). 135 F. App'x 218, 221 (11th Cir. 2005). By agreeing to join forces, the two companies had removed a potential bidder, which resulted in a lower purchase price that saved the companies "millions of dollars." *Id.* at 220. As redress, the plaintiff—whom neither company had paid—claimed these millions as a kind of brokerage fee

sounding in unjust enrichment. *Id.* At summary judgment, the plaintiff relied on a single communication—an e-mail from a non-party to the defendant about "an idea for [the two companies] to enter an agreement with NCL." *Id.* Based on this email, the plaintiff asked the district court—and later the Eleventh Circuit—to "infer that (1) [the plaintiff] actually recommended that [the two companies] jointly acquire NCL, and (2) [the plaintiff] was the procuring cause of the NCL joint venture." *Id.* at 221. The district court granted summary judgment, and the Eleventh Circuit affirmed, holding that "the inferences were . . . unreasonable." *Id.* In the Circuit's view, "[e]ven if the [plaintiff] suggested a joint venture, we conclude that a vague suggestion by an intermediary regarding a joint venture was insufficient as a matter of law to show that [the plaintiff] was the procuring cause of the joint venture." *Id.* Ultimately, the Eleventh Circuit agreed with the district court that "there was not more than a scintilla of evidence that Plaintiffs' efforts brought [the two companies] together for a joint venture worth over $1 billion." *Id.* at 219 (cleaned up).

Similarly, in *Stupak v. Hoffman-LaRoche*, the plaintiff alleged that the defendant's product caused asymptomatic users—that is, people who had previously exhibited no suicidal thoughts—to commit suicide. 326 F. App'x 553, 559 (11th Cir. 2009). In support, the plaintiff "identified at least 17 reports of accomplished suicides in [product-using] patients who exhibited no signs of depression before their suicides." *Id.* The district court granted summary judgment and the Eleventh Circuit affirmed, reasoning that, "[a]fter reviewing the case reports, it is clear that they are anecdotal, and do not establish whether the seventeen suicides reported were in fact asymptomatic, or whether the symptoms were simply not recorded in some of the case reports. . . . Seventeen such inconclusive case reports (out of millions of [] prescriptions) is simply insufficient to support an allegation that [the defendant] knew or should have known that [the product] could cause suicide without premonitory symptoms." *Id.* at 560. In the end, the Eleventh Circuit concluded that "[these reports] provide no

more than a 'scintilla of evidence' to support [the plaintiff's] claim that [the defendant] knew or should have known that [its product] could cause suicide without premonitory symptoms." *Id.*

The district courts have likewise put this standard to work. In *Morris v. Starbucks Corp.*, for instance, the plaintiff sued Starbucks after she spilled a cup of coffee on her lap. 2019 WL 7496785, at *3 (N.D. Ga. Sept. 27, 2019). In the plaintiff's view, the lid had been negligently secured and the coffee itself had been too hot—which is to say hotter than usual. *Id.* When she was driving with the cup between her legs, the plaintiff said, the lid came off—for reasons having nothing to do with her— and the coffee scalded her thighs. *Id.* The district court granted Starbuck's motion for summary judgment on the unsecured lid because "the Plaintiff's testimony, standing alone, cannot reasonably support the inference that specific acts of negligence on the part of the Defendant's employees caused the lid to come off. As the Defendant points out, the Plaintiff drove several hundred feet and took multiple turns with the cup nestled between her legs. Any inference that the cup lid came off due to the Defendant's employees' negligence, rather than the manner in which the Plaintiff was transporting the coffee, would be almost entirely speculative." *Id.* Turning to whether the coffee was unreasonably hot, the plaintiff's only evidence was her testimony that "the coffee was 'very, very hot through the sleeve [of the cup]" and "was hotter than an average cup of Starbucks coffee or an average cup of coffee." *Id.* at *4. In response, Starbucks showed that (1) its coffee machines were well-maintained and frequently serviced, (2) the machines brewed coffee at between 190 and 205 degrees Fahrenheit, and (3) its employees couldn't change the machines' settings. *Id.* Given all this, the district court concluded that the plaintiff "had not produced more than a scintilla of evidence that the coffee she received on the day of the accident exceeded the temperature at which the Defendant typically brews its coffee. Even accepting as true that the coffee was hotter than 'average,' a jury could not reasonably

infer from that fact alone the coffee's temperature fell outside the bounds of reasonable brewing temperatures[.]" *Id.*[18]

In all these cases, the plaintiffs adduced no *direct* evidence for their claim. Instead, in each case, the plaintiff submitted a fact—or set of facts—that was *one inference away* from establishing a genuine issue of material fact. So, for instance, in *Ship Construction*, the plaintiff had no direct evidence that it had brokered the joint venture. Instead, it had (1) an email (on the front end) showing that an intermediary had proposed the joint venture, and (2) a final agreement (on the back end) that was *consistent with* that proposal. These penumbral facts, however, weren't enough to bridge the gap— weren't enough, in other words, to raise a genuine issue of material fact about whether *the plaintiff* had actually influenced the outcome. Likewise, in *Stupak*, the plaintiff pointed to seventeen decedents— whose "case reports" contained no evidence of prior suicidal ideations—and asked the court, from this silence, to infer both that those decedents *actually exhibited* no such ideations and that those

---

[18] *See also Dugandzic v. Nike*, 807 F. App'x 971, 977 (11th Cir. 2020) (holding that the plaintiff's allegations "present[] a mere scintilla of evidence of bias, which is insufficient"); *Iysek Bed'N Linen v. Dutta-Roy*, 787 F. App'x 608, 612 (11th Cir. 2019) ("An unexecuted agreement to which [the counterclaim-plaintiff] was not a party and an ambiguous email are together, at most, a 'mere . . . scintilla' of evidence in support of [the counterclaim-plaintiff]'s contention that a contract existed between the parties. [The counterclaim-plaintiff] has presented no evidence of mutual assent between himself and [the counterclaim-defendant] regarding a plain and explicit set of terms, and no reasonable jury could infer that [the counterclaim-defendant] breached a contract with [the counterclaim-plaintiff]."); *Jackson v. Agency for Persons with Disabilities*, 608 F. App'x 740, 743–44 (11th Cir. 2015) (holding that, despite the ADA plaintiff's testimony that her termination was "close in time to her second eye surgery and termination of her workers' compensation benefits, and far in time from the incident [of misconduct]," the plaintiff's ADA claim failed because, "to the extent the timing could be indicative of pretext, it constituted no more than a scintilla of evidence"); *Corrado v. Super Fresh Food Mkt., Inc.*, 395 F. App'x 864, 866 (11th Cir. 2010) (holding that "[t]he crux of the dispute . . . is whether the [plaintiffs] have presented 'more than a scintilla' of evidence that [the defendant] had constructive notice that blueberries were on the floor of the produce department," and concluding that "[the plaintiffs] have failed to introduce any evidence, other than [the plaintiff's] fall itself, to indicate that [the defendant's] policy requiring clerks to make continuous, ongoing inspections of the produce floor was ineffective at keeping the store reasonably safe. We agree with the District Court that this does not meet the 'more than a scintilla' standard.").

seventeen cases should've put the defendant on notice. As we've discussed, however, the court was unwilling to take those steps—not because there was no evidence for the proposition but because, as the Supreme Court has said, the question at summary judgment is "whether [the evidence] is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52. Finally, in *Morris*, the plaintiff specifically testified both that the coffee was hotter than usual and that she had done nothing that could have resulted in the lid coming off. The ineluctable inference, she maintained, was that something happened at Starbucks that day—perhaps two different things—that both caused her coffee to brew hotter *and then* delivered an improperly-sealed cup. Given Starbucks's evidence, however—and, in particular, the documents about the machines' standard calibration—those two inferences were, in the court's view, implausible and (thus) unreasonable.

The same is true here. Alfonso has repeatedly said that Sunrise picked him up and drove him home in a black BMW. He said so to his doctors in the weeks and months after the incident; he said so in his sworn interrogatory answers (with the help of the very same law firm who's representing him here); and he said so in his trial testimony, under oath, before a judge and jury. That testimony, in turn, is perfectly consistent with all the other admissible evidence in the case—including the deposition testimony of Rivera and Anderson. Alfonso's whole defense, in other words, comes down to one line from Constantine's deposition—in which his neighbor insisted that the fall he witnessed happened in June. From this, Alfonso asks the Court to infer that he fell on June 7, 2016; that he was in the van Constantine, Rivera, and Anderson saw; that the van belonged to Sunrise; and that it was insured by RLI. But he has no evidence for any of these inferences.

Alfonso, then, has some evidence of a fall in June and some evidence that a van of unknown origin was in the area when he fell. But he has failed to connect these pieces either to the day in question (June 7, 2016) or, more importantly, to Sunrise and RLI. Given the overwhelming evidence— from Alfonso's own mouth—that, on June 7, 2016, Sunrise's owner transported him in a black BMW,

Constantine's insistence that the fall happened on one of June's 30 days is just too thin a reed. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." *Anderson*, 477 U.S. at 252 (emphasis added); *see also Matsushita Elec. Indus. Co.*, 475 U.S. at 587 ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."). The summary-judgment standard, in short, requires more than "some metaphysical doubt as to the material facts." *Id.* at 586.[19] And Alfonso has failed to meet that standard here.

\*\*\*

This is admittedly a tough call. It's not hard in the sense of figuring out what happened here. Indeed, if the Court were sitting as fact-finder, the problem would present little difficulty: Alfonso and his lawyers, who worked so hard to secure a favorable verdict by focusing the jury's attention on the dangerousness of Sunrise's conduct—the fast car, the low seatbelt, the speeding, the drugs, the alcohol, the yelling over the phone—found themselves, quite unexpectedly, without recourse, not because no one had harmed Alfonso, but because the very means by which the verdict was secured— that fast new car, those sleek low seatbelts—precluded coverage. At a trial, in short, ruling for RLI would be easy. The difficulty arises, however, when (as we must at summary judgment) we eliminate the Court's fact-finding powers and require it to define the contours of—and then deploy—an amorphous more-than-a-scintilla standard that we, as judges, have done a poor job of exploring. But, if that standard is to mean anything, it must mean that a plaintiff-cum-defendant who's sworn repeatedly and consistently to X, who has never disclaimed X, who (in fact) has presented *no evidence*

---

[19] Because RLI is entitled to summary judgment on its argument that the vehicle in which Alfonso was injured wasn't covered by the policy, the Court need not address Alfonso's contention that RLI should be estopped from asserting a coverage-exclusion defense. *See* Alfonso's Motion for Partial Summary Judgment at 6–7. Coverage exclusions, after all, become relevant only if the policy applies. Since the ride wasn't covered by the policy, the exclusions are inapposite.

that X is *not* true, cannot get to a jury on the theory that X never happened solely by virtue of implausible inferences drawn from the testimony of three people who *themselves* never suggest that X isn't true.

The easy thing, in other words, would be to deny summary judgment, to let a jury see through Alfonso's reversal, and to give RLI (albeit belatedly) the judgment it here deserves while granting Alfonso his day in court. It happens from time to time, though, that the simplest solutions aren't the right ones—or the just ones. This is such a case. A judge's role is to apply the law fairly and directly—without regard to expediency. With that general principle in mind, the Court hereby **ORDERS AND ADJUDGES** as follows:

1. RLI's Motion to Strike [ECF No. 44] is **GRANTED**.

2. RLI's Motion for Summary Judgment [ECF No. 35] is **GRANTED** as to Count I and **DENIED as moot** as to Count II.

3. Alfonso's Motion for Partial Summary Judgment [ECF No. 39] is **DENIED as moot**.

4. The Clerk shall **CLOSE** this case.

5. Pursuant to FED. R. CIV. P. 58, the Court will enter an order of final judgment separately.

6. All other pending motions are **DENIED as moot**, all hearings are **CANCELLED**, and any deadlines are **TERMINATED**.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 8th day of February 2021.

**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record